**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SCHULMERICH BELLS, LLC,** <br> A Pennsylvania Limited Liability Company, on behalf of itself and others similarly situated <br><br> and <br><br> **FRANK CARBALO,** <br> On behalf of himself and others similarly situated <br><br> and <br><br> **WENDY HELVERSON,** <br> On behalf of herself and others similarly situated <br> Plaintiffs, <br><br> v. <br><br> **THOMAS W. WOLF, in his official capacity as Governor of the Commonwealth of Pennsylvania,** <br><br> and <br><br> **RACHEL LEVINE, MD, in her official capacity as Secretary of the Pennsylvania Department of Health** <br><br> Defendants. | CIVIL ACTION <br><br> No. |

## <u>COMPLAINT</u>

*"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."*

*Armstrong v. United States*, 364 U.S. 40, 49 (1960)

The above named Plaintiffs, by their attorneys, hereby bring this action for declaratory and injunction relief, and monetary damages, on behalf of themselves and all other similarly situated persons, companies and entities (collectively, "Plaintiffs"), and against Thomas W. Wolf, in his official capacity as Governor of the Commonwealth of Pennsylvania ("Governor Wolf" or "Governor"), and Rachel Levine, MD, in her official capacity as Secretary of the Pennsylvania Department of Health ("Dr. Levine").  The Governor and the Secretary have seized without compensation the property of businesses and the livelihoods of individuals across the Commonwealth, forcing indefinite closures and widespread layoffs.  These uncompensated seizures violate the Takings Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment, and also violate well-established notions of Substantive and Procedural Due Process.  Plaintiffs respectfully request that this Court (i) declare the Governor's actions unconstitutional, and (ii) order the payment of just compensation.

The Governor and Secretary issued a series of Executive Orders on March 19 and March 20, 2020 ("COVID-19 Closure Orders" or "Orders"), for the public purpose of protecting Pennsylvania's public health, safety and welfare. A true and correct copy of these Orders, including all documents enclosed or incorporated within said Orders, are attached to this Complaint as Exhibit "A."  The Governor has placed the cost of these Orders – issued for the benefit of the public – squarely upon the shoulders of private individuals and their families, and has failed to justly compensate affected parties for these takings undertaken for their benefit to the public.  Without extending constitutionally required just compensation to Plaintiffs and those similarly situated, these Orders jeopardize the sustainability of many Pennsylvania businesses and the livelihoods those businesses provide to individuals.  In support of this demand for relief, Plaintiffs state as follows.

2

## INTRODUCTION

1.      Plaintiffs are individuals and businesses from across the Commonwealth of Pennsylvania, and are members of two distinct classes adversely affected by the Governor's actions: (i) affected businesses ordered to shutdown by the COVID-19 Closure Orders ("Business Class Members") and (ii) individual workers displaced from their gainful employment as a result of the same Executive Orders ("Employee Class Members").

2.      In the wake of a fast moving disease outbreak, Plaintiffs stand on the precipice of economic collapse as a direct result of the actions taken by Governor Wolf and Dr. Levine in response to the novel coronavirus ("COVID-19") pandemic.

3.      As noted above, the Governor issued the COVID-19 Closure Orders on March 19 and March 20, 2020, to protect Pennsylvania's public health, safety and welfare.  These Orders mandated that all "non-life sustaining" businesses immediately cease operations at their physical locations, that their employees not work at these physical locations, and that this mandate to stay closed remain in force indefinitely.

4.      The Governor claimed his authority to enact the Orders by citing a set of broad emergency statutes which he said authorized his actions to stem the spread of COVID-19 across Pennsylvania.  This suit <u>does not</u> seek to contest whether Governor's decision to issue the COVID-19 Closure Orders were prudent or within his authority to issue.

5.      This suit accepts as fact that Governor Wolf took action for a public purpose.  As he stated in the preamble to the March 19th Order, "the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared [COVID-19] a 'public health emergency of international concern,' and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency."

6.      The Governor's actions were not designed to serve Plaintiffs' private interests, nor did the Governor identify any private interest served by his actions.

7.      Notwithstanding their legitimate public purpose, the Governor's Orders halted all economic activity for Business Class Members and Employee Class Members, the people and businesses covered by his Orders.  The COVID-19 Closure Orders "make it commercially impracticable" to use the property belonging to the Business Class Members for any economically beneficial purpose, and inflict "very nearly the same effect for constitutional purposes as appropriating or destroying [the property as a whole]."  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414–15 (1922); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 484–85 (1987) (explaining that regulatory taking occurs when the government action "makes it impossible for petitioners to profitably engage in their business, or that there has been undue interference with their investment-backed expectations").

8.      The property of Business Class Members, which the Governor's Orders render unusable, includes both the real property in which the businesses are physically located ("Physical Location") and the tangible property housed in such locations – such as machinery, inventory, tools, business records, and other forms of tangible equipment used in operating each business ("Tangible Property") (both forms of property collectively referred to as "Property").

9.      Despite issuing the COVID-19 Closure Orders for a readily-apparent public purpose, the Governor did not provide compensation for those who suffered substantial – and perhaps total – diminution of value in their property interests as a result. The COVID-19 Closure Orders by their operative provisions deprived Business Class Members of all economically beneficial use of their Property and deprived Employee Class Members of their livelihoods for an undefined time period.

4

10.     Businesses Class Members were ordered to close under threat of fines, unspecified criminal penalties and denial of access to disaster relief funding and services, which penalties were announced publicly and contemporaneously with the release of the COVID-19 Closure Orders.

11.     The Orders constitute a regulatory taking implemented for a recognized public purpose, and therefore the failure to pay just compensation contravenes the Takings Clause of the Fifth and Fourteenth Amendments.  *See Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992); *Horne v. Dep't of Agric.*, 576 U.S. 350, 135 S. Ct. 2419, 2426 (2015) ("Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

13.     This is a class action where Plaintiffs seek relief under 28 U.S.C. §§ 2201-2202, 42 U.S.C. §§ 1983 and 1988, and the Fifth and Fourteenth Amendments.  U.S. CONST. AMEND. V, XIV; *see also* Fed. R. Civ. P. 23.

14.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiffs' claim occurred in this district.

## PARTIES

15.     Schulmerich Bells, LLC ("Schulmerich") is a named Plaintiff and a member of the Business Class; it is a Pennsylvania limited liability corporation, with its principle place of business located in Hatfield, Bucks County, Pennsylvania ("Hatfield Facility"), which is the site of its sole Physical Location and where the vast majority of its Tangible Property is stored.

16.     Frank Carbalo ("Frank") is a named Plaintiff and a member of the Employee Class; Frank is an adult individual and citizen of Pennsylvania, who resides in Montgomery County, Pennsylvania.

17.     Wendy Helverson ("Wendy") is a named Plaintiff and a member of the Employee Class; Wendy is an adult individual and citizen of Pennsylvania, who resides in Bucks County, Pennsylvania.

18.     Defendant Governor Thomas W. Wolf, named in his official capacity, is the Governor of the Commonwealth of Pennsylvania and is responsible for enforcing the laws of the Commonwealth of Pennsylvania, and is charged with implementing policy through executive orders, including the Executive Orders issued on March 19 and March 20, 2020.

19.     Defendant Rachel Levine, MD, named in her official capacity, is the Secretary of the Pennsylvania Department of Health and is responsible for enforcing and implementing laws, regulations and policies aimed at the public health of Pennsylvania and its citizens, including the COVID-19 Closure Orders; Dr. Levine is also responsible for advising Governor Wolf and other officials regarding issues of public health.

**FACTS**

*COVID-19 Pandemic and*
*Governor Wolf's Executive Order on March 19, 2020*

20.     On March 19, 2020, Governor Wolf issued the COVID-19 Closure Order, which mandated the shutdown of all business not deemed "life sustaining."

21.     The World Health Organization ("WHO") and the Center for Disease Control and Prevention ("CDC") identified the novel coronavirus ("COVID-19") as a "public health emergency of international concern."

22.     Likewise, the U.S. Department of Health and Human Services ("HHS") declared that COVID-19 has created a public health emergency.

23.     On March 6, 2020, Governor Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth of Pennsylvania under 35 Pa. C.S. § 7301(c).

24.     As the perambulatory language of the COVID-19 Closure Orders indicate, Governor Wolf relies upon a number of different sources to justify the executive action he undertook to address the threat of the COVID-19 pandemic.  *See e.g.,* Exhibit A (citing 35 Pa. C.S. § 7301(b).

25.     Specifically, Governor Wolf asserted his authority "to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein[.]"  *See* Exhibit A (citing 35 Pa. C.S. § 7301(f)).

26.     The COVID-19 Closure Orders further identify Dr. Levine's authority as the Secretary of Health, "to determine and employ the most efficient and practical means for the prevention and suppression of disease" … "[which] include isolation, quarantine, and any other control measure needed."  *See* Exhibit A (citing 71 P.S. § 532(a), 71 P.S. 1403(a) and 35 P.S. § 521.5).

7

27.     The COVID-19 Closure Orders allow only businesses categorized as "life sustaining" to remain in operation at their physical locations.  *See* Exhibit A ("No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public.").

28.     The COVID-19 Closure Orders authorize "life sustaining" businesses to remain operational at their physical locations, so long as those businesses implemented safety precautions delineated by the CDC.

29.     The Order of March 19, 2020 included as an attachment a list of businesses deemed to be "life sustaining."  The Governor subsequently issued a revise list when he issued his second Order on March 20, 2020.  Wolf then issued a third revised list on the afternoon of March 24, 2020.  *See* Exhibit A.

30.     Governor Wolf originally sought to enforce these mandated shutdowns by March 21, 2020, at 12:01 a.m.; however, he decided to delay enforcement until March 23, 2020, at 8 a.m.

31.     Any business operating out of compliance with the COVID-19 Closure Orders is subject to the possibility of severe fines and penalties, including the denial of government assistance and disaster relief.

32.     Notably absent from the COVID-19 Closure Orders, or any other executive orders issued by Governor Wolf, is any provision addressing the inherent financial burden inflicted by the Orders on individuals and businesses throughout Pennsylvania – a direct result of the mandated shutdowns.

33.     The COVID-19 Closure Orders "will remain in effect until further notice." Exhibit A.

8

34.     As of the filing of this Complaint, these Orders remain in effect with no end date announced.

*Schulmerich Bells, LLC*

35.     Plaintiff Schulmerich is the oldest manufacturer of orchestral quality musical handbells and handchimes in the United States.

36.     Schulmerich is based at its Hatfield Facility in Bucks County, Pennsylvania.

37.     In the COVID-19 Closure Orders, Schulmerich's business was not categorized as an "essential" or "life-sustaining" business that would be permitted to stay open when Governor Wolf ordered several categories of businesses to close for the stated public purpose of controlling COVID-19 to protect public health.

38.     Schulmerich's busiest time of year is the spring and summer when various handbell performing groups send their instruments to Schulmerich for repair and refurbishment at its Hatfield facility.

39.     Timing is crucial for these repairs.

40.     School based performing groups must contract in early spring, generally February and March, for one of a limited number of available refurbishment slots on Schulmerich's calendar that will ensure that a particular school's instruments can be sent to Schulmerich in the narrow window between the end of the school's performing season in the early spring and the commencement of the school's next performing season at the start of the following school year.

41.     Church based performing groups contract during the same window to ensure that they can send their instruments to Schulmerich after the conclusion of their performance season, generally around the Easter holidays, and have the instruments back for the fall practice season which gears up in the months before Christmas.

42.     A group that misses these narrow booking windows may not be able to refurbish their instruments and will generally wait a year until the following summer to refurbish.

43.     The refurbishment business is a substantial portion of Schulmerich's overall business each year.

44.     The COVID-19 Closure Orders closed Schulmerich in the midst of its spring refurbishment season.

45.     Schulmerich already had in its factory a number of time sensitive refurbishment orders sent to Schulmerich by schools and churches across the world under tight scheduling constraints designed to return the instruments to groups with publicly announced performance and concert schedules.

46.     To enable it to perform this refurbishment work, Schulmerich had ordered and received hundreds of thousands of dollars in parts from its suppliers.   Some parts have acquisition lead times as long as sixteen (16) weeks.

47.     With the COVID-19 Closure Orders, Schulmerich was unable to book additional refurbishments or undertake the refurbishments that were already in its factory when the factory was ordered closed by Governor Wolf.

48.     Under threat of fines, unspecified criminal penalties and denial of access to disaster relief funding and services, Schulmerich and other Business Class Members are substantially denied the use of their Tangible Property and their Physical Locations for the full duration of the COVID-19 Closure Orders.

49.     By denying Schulmerich and other Business Class Members access to their Physical Locations, they were unable to generate any additional sales or other forms of revenue, to collect the bulk of their outstanding receivables or pay many of their payables.

10

50.     As a result, the working capital of Schulmerich and other Business Class Members was severely constrained and they were forced to immediately reduce their expenses in order to survive until the COVID-19 Closure Orders are lifted.

51.     The same day as the first COVID-19 Closure Order, Schulmerich was forced to lay off nine (9) workers, irreparably damaging its sterling reputation with its workforce.  Many Business Class Members were forced to undertake similar layoffs.

52.     With his forced closures, Governor Wolf caused considerable damage to Schulmerich's business and the business of all Business Class Members, to their reputations, and to their relationships with their customers, vendors and employees.

53.     Specifically, the closures occurred when Schulmerich was preparing to book and receive its summer refurbishments and when it was undertaking its early spring refurbishments. This only added to the damage caused to its business reputation and relationships.

54.     Neither Governor Wolf, Dr. Levine, nor the Commonwealth of Pennsylvania offered compensation to Schulmerich in exchange for the total regulatory seizure of Schulmerich's property.

55.     The COVID-19 Closure Orders prevent Schulmerich and other Business Class Members from using their Physical Location or their Tangible Property in any economically beneficial manner.  The Orders require that Schulmerich, other Business Class Members and their Tangible Property sit idle in Physical Locations they are prohibited from accessing.

56.     During the pendency of the COVID-19 Closure Orders while they have no use of their Tangible Property and their Physical Locations, the value of Schulmerich's and Business Class Members' Property is substantially diminished.

*Frank Carbalo and Wendy Helverson*

57.     Frank Carbalo, a male, has worked at Schulmerich for approximately 6 years.

58.     Wendy Helverson, a female, has worked at Schulmerich and its predecessor entities for approximately 15 years.

59.     Frank and Wendy are hardworking and committed employees, who routinely receive praise for their work at Schulmerich.  Both are highly skilled artisans with deeply specialized skills in the manufacture of tuned musical handbells.

60.     Wendy's and Frank's skills are not easily transferrable to other professions, particularly since there is only one other manufacturer of musically tuned handbells in the entire world and it, too, is located in Bucks County, Pennsylvania.  That other Pennsylvania handbell manufacturer, a member of the Business Class, was also forced to close as a result of COVID-19 Closure Orders.

61.     Frank is a navy veteran who came to this country as a child after being chased from Cuba by Castro and his communists.

62.     Wendy is a widow and is the primary breadwinner in a three-generation household, where she cares for her daughter and grandchild.

63.     Before the COVID-19 Closure Orders, Frank had been contemplating his eventual retirement and Wendy had been satisfied in the knowledge that she earned a living capable of providing for her family.

64.     Now, they and other Employee Class Members are solely concerned with surviving day-to-day and left to wonder whether they will ever be allowed to return to work – or if their employers and their jobs will still exist once the Governor's Orders are finally lifted.

65.     The COVID-19 Closure Orders purported to shutdown all non-"life-sustaining" businesses to preserve public health, safety and welfare; however, the Orders paid no attention to the substantial and adverse impact such closures would have on the livelihoods of workers like Frank, Wendy and other Employee Class Members.

66.     The COVID-19 Closure Orders forced Schulmerich to layoff both Wendy and Frank; countless other Pennsylvania workers, who were similarly situated – the other Employee Class Members – suffered the same consequences as the Governor's Orders closed other businesses.

67.     With no revenue coming in and no orders shipping, small employers like Schulmerich and other Business Class Members cannot afford to continue paying workers when their businesses are forced to close their doors at Governor Wolf's direction.

68.     Because of Governor Wolf's Orders, Wendy, Frank and other Employee Class Members no longer have a regular paycheck or healthcare benefits (unless they choose, at their own expense, to pay the costs of health insurance individually).

69.     All Employee Class Members, like Frank and Wendy, recognize the exigent nature of the extant public health emergency; nevertheless, they question why employees and small business are asked to bear the cost for the measures that Governor Wolf and Dr. Levine have determined are necessary to support public health.

70.     Frank, Wendy and other Employee Class Members have applied for unemployment, but they remain uncertain of when they will receive their first payment. Notwithstanding various bills working their way through Congress that purportedly will make them whole for their lost wages, they are both cognizant of the fact that unemployment only

replaces a fraction of their former paychecks from Schulmerich and other Business Class Members.

71.     The COVID-19 Closure Orders specify that they "will remain in effect until further notice[,]" which is terrifying for workers like Frank, Wendy and other Employee Class Members.  They fear contracting the novel coronavirus, but they equally fear the ominous and looming possibility that – soon – they will be unable to pay their bills or buy food for their families without paychecks.

72.     The longer the COVID-19 Closure Orders remain in effect, and the longer Pennsylvanians live without a clear end date for the closure of their businesses, the greater the fear of economic ruin becomes for employees like Wendy, Frank and other Employee Class Members.

73.     Frank, Wendy and other Employee Class Members cannot simply find new employment or an alternative source of income.  This is particularly true of Frank and Wendy, who have highly specialized skill sets.  Moreover, the COVID-19 Closure Orders direct Employee Class Members to stay home until the Orders are lifted, making a job search a near impossibility.

74.     It shocks the conscience, and is arbitrary and capricious, to allow employees – and the small businesses that employ them – to privately bear without compensation the cost of the COVID-19 Closure Orders, orders which were issued for the public purpose of slowing the spread of the novel coronavirus across Pennsylvania.

## CLASS ALLEGATIONS

### *Schulmerich Bells, LLC and Business Class Members*

75.     Schulmerich brings this action on behalf of the all Business Class Members pursuant to provisions of Federal Rules of Civil Procedure 23 (a), (b)(1), (b)(2) and/or (b)(3). Fed. R. Civ. P. 23(a), (b)(1)-(3).

76.     Schulmerich and Business Class Members are, as noted above, affected businesses ordered to shutdown by the COVID-19 Closure Orders.

77.     The class consists of all businesses who satisfy each of the following criteria:

> (a)     At the time when the COVID-19 Closure Orders became effective, they were (i) categorized as "non-life sustaining" and, thus, (b) instructed to shutdown by the COVID-19 Closure Orders;
>
> (b)     They applied for an exemption waiver from the Pennsylvania Department of Community Development, as directed, and either received no response or received a denial; and
>
> (c)     They cannot perform all of their normal business operations through alternative means, such as telecommuting.

78.     Excluded from the class are any individual, company or entity that was categorized as "life sustaining" according the list attached to the Governor's COVID-19 Closure Orders, including all subsequent updates and revisions to the list, and thus authorized to continue operating at its Physical Location.  Also excluded from the class are all directors, officers, employees, parents, affiliates and subsidiaries, their successors, agents, legal representatives, heirs and assigns, and any persons or entities controlled by any excluded individual, company or entity.

79.     This class is so numerous that joinder of all members is impractical.  The class is composed tens of thousands of businesses across the Commonwealth of Pennsylvania.

80.     As the named Plaintiff, Schulmerich's claims are typical of the claims of the Business Class.  All of the claims are based on the same factual and legal theories.

81.     Schulmerich will fairly and adequately protect the interests of the class.   It is committed to litigating this matter vigorously. Schulmerich has retained counsel experienced at handling constitutional claims against government actors, often involving questions of substantive and procedural due process and violations of the Takings Clause.     Neither Schulmerich, nor counsel for Schulmerich, has any interest that might cause either not to pursue this action vigorously.

82.     Class certification under Fed. R. Civ. P. 23(b)(1) is appropriate in this action because prosecuting separate actions by or against individual class members would create a risk of either:

      (a)     Inconsistently or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing class; or

      (b)     Adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

83.     Class certification under Fed. R. Civ. P. 23(b)(2) is appropriate in this action because Governor Wolf and Dr. Levine have acted on grounds that apply generally to the

Business Class – that is, *inter alia*, issuance of the COVID-19 Closure Orders – so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

84.    Class certification under Fed. R. Civ. P. 23(b)(3) is appropriate in this action because there are numerous questions of law and fact which are common to the Business Class and which predominate over any questions affecting individual members of the Class, including, without limitation, the following:

(a)    Whether the COVID-19 Closure Orders affected a regulatory taking upon businesses who were classified as "non-life sustaining" and thus instructed to halt all business operations – ceasing all economically beneficial uses of their Physical Location and of their Tangible Property – without providing just compensation;

(b)    Whether the COVID-19 Closure Orders violated the substantive due process rights of affected businesses by arbitrarily, capriciously and irrationally interfering with such businesses' fundamental right to use and enjoy of such their Physical Locations and Tangible Property in such a manner that would shock the conscience; and

(c)    Whether COVID-19 Closure Orders violated the substantive due process rights of affected businesses by arbitrarily, capriciously and irrationally interfering with their fundamental Property and liberty interests without providing *any* procedural safeguards, either before, during or after the government interference or deprivation.

17

85.     Indeed, the only individual question appears to be the amount of monetary damage suffered as a result of the COVID-19 Closure Orders – and thus, just compensation owed – which is attributable to each Business Class Member.

86.     Class certification under Fed. R. Civ. P. 23(b)(3) is also appropriate in this action because a class action is superior to other methods for the fair and efficient adjudication of this controversy, in that:

(a)     The critical facts and applicable questions of law are identical across all Business Class Members, even though the effects of the COVID-19 Closure Order may be small to some members of the Class, and establishing whether Governor Wolf's actions were unconstitutional is complex, such that prosecution of individual actions is impractical and not economically feasible;

(b)     By contrast, the cumulative damages caused by the COVID-19 Closure Orders across all Members of the Business Class is substantial;

(c)     In the absence of the class action device, Schulmerich and Business Class Members would be left without a remedy for the wrongful acts alleged, and Defendants' allegedly unconstitutional actions would be left unchallenged;

(d)     The prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to the individual class members, which would establish incompatible standards of conduct for Governor Wolf and Dr. Levine, making

18

concentration of the litigation concerning this matter in this Court desirable; and

(e)     No unusual difficulties are likely to be encountered in the management of this action as a class-action.

*Frank, Wendy and Employee Class Members*

87.     Frank and Wendy bring this action on behalf of the all Employee Class Members pursuant to provisions of Federal Rules of Civil Procedure 23 (a), (b)(1), (b)(2) and/or (b)(3). Fed. R. Civ. P. 23(a), (b)(1)-(3).

88.     Frank, Wendy and Employee Class Members are, as noted above, individual workers displaced from their gainful employment as a result of the Governor's COVID-19 Closure Orders.

89.     The class consists of all displaced workers who satisfy each of the following criteria:

(a)     At the time when the COVID-19 Closure Orders became effective, they were employees of businesses (i) categorized as "non-life sustaining" and, thus, (b) instructed to shutdown by the COVID-19 Closure Orders; and

(b)     As a result of the mandated shutdown, they were subject to a layoff, furloughed, or suffered a reduction in work hours or overall compensation.

90.     Excluded from the class are (i) any unemployed individual when the COVID-19 Closure Orders became effective, or (ii) any individual who worked for a business categorized as "life sustaining" according the list attached to the Governor's COVID-19 Closure Orders,

including all subsequent updates and revisions to the list, and thus authorized to continue operating at its Physical Location.  Also excluded from the class are all directors, officers, employees, parents, affiliates and subsidiaries, their successors, agents, legal representatives, heirs and assigns, and any persons or entities controlled by any excluded individual, company or entity.

91.     This class is so numerous that joinder of all members is impractical.  The class is composed tens of thousands – and possibly millions – of individual workers across the Commonwealth of Pennsylvania.

92.     As the named Plaintiffs, Frank and Wendy's claims are typical of the claims of the Employee Class.  All of the claims are based on the same factual and legal theories.

93.     Frank and Wendy will fairly and adequately protect the interests of the class. They are committed to litigating this matter vigorously. Frank and Wendy have retained counsel experienced at handling constitutional claims against government actors, often involving questions of substantive and procedural due process and violations of the Takings Clause. Neither Frank, Wendy, nor their counsel, has any interest that might cause them not to pursue this action vigorously.

94.     Class certification under Fed. R. Civ. P. 23(b)(1) is appropriate in this action because prosecuting separate actions by or against individual class members would create a risk of either:

    (a)     Inconsistently or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing class; or

(b)     Adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

95.     Class certification under Fed. R. Civ. P. 23(b)(2) is appropriate in this action because Governor Wolf and Dr. Levine have acted on grounds that apply generally to the Employee Class – that is, *inter alia*, issuance of the COVID-19 Closure Orders – so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

96.     Class certification under Fed. R. Civ. P. 23(b)(3) is appropriate in this action because there are numerous questions of law and fact which are common to the Employee Class and which predominate over any questions affecting individual members of the Class, including, without limitation, the following:

(a)     Whether the COVID-19 Closure Orders violated the substantive due process rights of affected individual workers by arbitrarily, capriciously and irrationally interfering with, *inter alia*, the right to pursue any "lawful calling, business, or profession [Employee Class Members] may choose" in such a manner that would shock the conscience. *Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) (citing *Dent v. West Virginia,* 129 U.S. 114, 121-122 (1889)).

97.     Indeed, the only individual question appears to be the amount of monetary damage suffered as a result of the COVID-19 Closure Orders – and thus, just compensation owed – which is attributable to each Employee Class Member.

21

98.     Class certification under Fed. R. Civ. P. 23(b)(3) is also appropriate in this action because a class action is superior to other methods for the fair and efficient adjudication of this controversy, in that:

(a)     The critical facts and applicable questions of law are identical across all Employee Class Members, even though the effects of the COVID-19 Closure Order may be small to some members of the Class, and establishing whether Governor Wolf's actions were unconstitutional is complex, such that prosecution of individual actions is impractical and not economically feasible;

(b)     By contrast, the cumulative damages caused by the COVID-19 Closure Orders across all Members of the Employee Class is substantial;

(c)     In the class action device, Frank, Wendy and Employee Class Members would be left without a remedy for the wrongful acts alleged, and Defendants' allegedly unconstitutional actions would be left unchallenged;

(d)     The prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to the individual class members, which would establish incompatible standards of conduct for Governor Wolf and Dr. Levine, making concentration of the litigation concerning this matter in this Court desirable; and

(e)      No unusual difficulties are likely to be encountered in the management

of this action as a class action.

**COUNT I**

**Schulmerich, and Similarly Situated Business Class Members**
**v.**
**Defendants**

**VIOLATION OF THE TAKINGS CLAUSE—42 U.S.C. §1983**

**COVID-19 Closure Orders Are an Unconstitutional Regulatory Taking of Schulmerich's**
**and Business Class Members' Property Without Just Compensation in Violation of**
**the Fifth Amendment's Takings Clause As Incorporated under the Fourteenth Amendment**

99.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

100.    The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. CONST. AMEND. V.

101.    The Takings Clause "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315 (1987) (emphasis in original)).

102.    The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

103.    Governor Wolf, in accordance with the advice of Dr. Levine, issued the COVID-19 Closure Orders as a means of slowing the spread of the novel coronavirus.

104.    Governor Wolf and Dr. Levine have acted under color of state law, and the COVID-19 Closure Orders were issued to serve a well-recognized public purpose by a duly elected state official and his designee.

24

105.    The COVID-19 Closure Orders adversely impacted Schulmerich and Business Class Members' use of their Tangible Property and Physical Locations to such an extent that, at least temporarily, the Orders entirely diminished the economically beneficial use of those Properties.

106.    During the indefinite period of shutdown, the Orders prohibited *all* economically beneficial and profitable uses of Schulmerich's Tangible Property and Physical Location and that of other Business Class Members; save bare ownership, the entire bundle of property rights was extinguished.

107.    Schulmerich and Business Class Members were not permitted to use their Tangible Property or Physical Locations in any fashion to run their businesses; instead, the COVID-19 Closure Orders required Physical Locations housing "non-life sustaining" businesses to remain idle.

108.    As a practical matter, the Orders prevented the affected Physical Locations from being leased, subleased, bought, sold or used for other purposes.  The Orders also effectively prevented the hiring of workers to use the Tangible Property belonging to Schulmerich and Business Class Members or to assemble and ship goods built from their inventories. Accordingly, the COVID-19 Closure Orders interfered with the ordinary investment expectations of Schulmerich and Business Class Members as property holders.

109.    The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 537

110.    "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

111.    Governor Wolf's COVID-19 Closure Orders "goes too far" and must "be recognized as a taking." *See id*.

112.    Otherwise, without just compensation guaranteed by the Takings Clause, Schulmerich and all Business Class Members similarly situated will be privately saddled with the cost of paying for government action undertaken for the common good.

113.    Schulmerich and Business Class Members have suffered a complete loss of "*all* economically beneficial uses" of their Property while the COVID-19 Closure Orders remain in effect.  This complete loss constitutes a categorical taking, whether it be Schulmerich and Business Class Members' inability to operate their businesses at their Physical Locations or their inability to exercise any of their other property rights with regard to their Tangible Property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992).

114.    Schulmerich and all Business Class Members who are similarly situated, " h[ave] been called upon to sacrifice all economically beneficial uses [for their Properties] in the name of the common good, that is, to leave [their] propert[ies] economically idle, [they] h[ave] suffered a taking." *Lucas*, 505 U.S. at 1019.

115.    In the alternative, under the framework articulated by the Supreme Court in *Penn Central*, the COVID-19 Closure Orders constitute a taking based upon "the magnitude of [the Orders'] economic impact and the degree to which [the Orders] interfere[] with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

26

116.   The Supreme Court's analysis in *Penn Central* sets forth the framework for assessing whether government action is considered a regulatory taking, identifying "several factors that have particular significance." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978).

> On the other hand, if the regulation "fall[s] short of eliminating all economically beneficial use, a taking nonetheless may have occurred," *Palazzolo* [*v. Rhode Island*]*,* 533 U.S. [606] at 617, 121 S.Ct. 2448[, 150 L.Ed.2d 592 (2001)], and **the court looks to three factors to guide its inquiry: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action,"** *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo,* 533 U.S. at 634, 636, 121 S.Ct. 2448 (O'Connor, J., concurring); *see also Tahoe–Sierra,* 535 U.S. at 321, 122 S.Ct. 1465 (whether a taking has occurred "depends upon the particular circumstances of the case"); *Yee v. City of Escondido,* 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (regulatory takings claims "entail[ ] complex factual assessments").

*Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219, 228 (2014) (emphasis added).

117.   Since the onset of Governor Wolf's COVID-19 Closure Orders, Schulmerich and Business Class Members have not been permitted to use their Physical Locations to operate their businesses, nor have then been allowed to use their Tangible Property for any economically profitable use.

118.   With less than 24 hours of notice, Governor Wolf ordered Schulmerich and Business Class Members to cease operations at their businesses.  This is not nearly enough time to reconfigure an ordinary small business concern to allow for productive use of its assets when denied access to its Physical Location.

119.   Schulmerich has ceased manufacturing operations at its Hatfield Facility since the Governor's Orders classified it as a "non-life sustaining" business.  The Governor's Orders

required all other Members of the Business Class to do the same at their respective Physical Locations.

120.     Schulmerich has made efforts to maintain minimal contact with its customers and employees through practices like telecommuting – the only operations permissible for "non-life sustaining" businesses under the Orders.

121.     Schulmerich, like all Business Class Members similarly situated, has sat almost entirely idle at the Governor's direction.

122.     The Governors' COVID-19 Closure Orders "will remain in effect until further notice[,]" and, as a result, Schulmerich – and all Business Class Members similarly situated – are deprived of the value of their Tangible Property and Physical Locations while the Orders are in effect.  The Physical Locations of Schulmerich and of other Business Class Members are not usable for any purpose, nor can these affected Physical Locations currently be bought, sold or leased, nor can Schulmerich's and Business Class Members' Tangible Property be used to generate income while the Orders are in effect.

123.     The COVID-19 Closure Orders have either entirely drained Schulmerich and Business Class Members' Property of all economic value during their pendency, or have nearly done so; in either event, the diminution of value and government interference caused by these Orders is an unconstitutional taking without just compensation.

**COUNT II**

**Schulmerich, and Similarly Situated Business Class Members**
**v.**
**Defendants**

**SUBSTANTIVE DUE PROCESS—42 U.S.C. §1983**

**COVID-19 Closure Orders Deprives Schulmerich and Business Class Members of**
**Life, Liberty and/or Property without Due Process of Law**
**in Violation of the Fourteenth Amendment**

124.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

125.    Never in the modern history of the United States – even in war time – has such a large swath of the Pennsylvania economy been idled for so long by a government order.

126.    Schulmerich and Business Class Members have a protected liberty interest in their right to live without arbitrary governmental interference, and a protected fundamental property right to use and enjoy land in which they hold a recognized interest (such as fee simple, or as a leasehold).  *See MFS, Inc. v. DiLazaro,* 771 F. Supp. 2d 382, 440–41 (E.D. Pa. 2011) (*citing DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell,* 53 F.3d 592, 600 (3d Cir.1995)); *see also Horne*, 576 U.S. 350, 135 S. Ct. at 2426.

127.    The Supreme Court "ha[s] emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government[.]"  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)).

128.    "[T]he fault [may] lie[] in a denial of fundamental procedural fairness … or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]"  *Id*. at 845-846 (citations omitted).

29

129.    "'[S]ubstantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty[.]'" *United States v. Salerno,* 481 U.S. 739, 746 (1987) (quoting *Rochin v. California,* 342 U.S. 165, 172 (1952), and *Palko v. Connecticut,* 302 U.S. 319, 325–326 (1937)).

130.    "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (quotations omitted).

131.    The COVID-19 Closure Orders enacted by Governor Wolf, upon the advice of Dr. Levine, as set forth above, constitute arbitrary, capricious, irrational and abusive conduct which unlawfully interferes with Schulmerich and Business Class Members' liberty and property interests protected by the due process clause of the Fourteenth Amendment to the United States Constitution.

132.    Defendants have acted under color of state law with the intent to unlawfully deprive the Schulmerich and Business Class Members of their liberty and property without substantive due process in violation of the Fourteenth Amendment to the United States Constitution.

133.    Defendants' actions, including issuance and enforcement of the COVID-19 Closure Orders, constitute the official policy, custom, and practices of the Commonwealth of Pennsylvania.

134.    The COVID-19 Closure Orders "impinge[] upon [Schulmerich's] use and enjoyment of [its] property [in Hatfield]" and separately impinges upon the use of its Tangible Property. *See DeBlasio,* 53 F.3d at 601.  The same is true of the other Business Class Members with regard to their Physical Locations and Tangible Property.  Therefore, Governor Wolf and

Dr. Levine have violated Schulmerich and other Business Class Members' substantive due process rights. *See also Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) (concluding that state's police power was "subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably," and that such was requiring a railroad to bear the expense associated with construction of a public road and moving train tracks accordingly).

135.    Governor Wolf and Dr. Levine have arbitrarily, irrationally and capriciously "impinge[d] upon [Schulmerich's] use and enjoyment of [its] property [in Hatfield]" by, *inter alia*, requiring Schulmerich – and the other Business Class Members – to shutdown indefinitely and to privately bear the burden for such publicly beneficial decisions, which are aimed at slowing the spread of the novel coronavirus. *See DeBlasio,* 53 F.3d at 601.

136.    Governor Wolf and Dr. Levine implemented the COVID-19 Closure Orders for the purpose of preserving public health, safety and welfare. The implementation of these Orders, however, caused Schulmerich, its employees and those similarly situated substantial economic harm which they are being asked to privately bear for a manifest public benefit. This is also the case for the other Business Class Members and their corresponding Employee Class Members.

137.    The Governor's behavior "'shocks the conscience' and violates the 'decencies of civilized conduct.'" *See Lewis*, 523 U.S. 833, 846–47 (citations omitted). "[I]t d[oes] not comport with traditional ideas of fair play and decency" and therefore violates substantive due process. *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957).

138.    Defendants' intentional, willful and wanton conduct 'shocks the conscience' of all citizens, who fear unchecked government intrusion for arbitrary and capricious ends – even if such ends are not ill intentioned.

139.     In depriving Schulmerich and other Business Class Members of their liberty and property interests without due process of law, the Defendants have acted intentionally, willfully, wantonly, and with callous and reckless disregard for Plaintiffs' constitutional rights.

140.     As a direct and proximate result of the COVID-19 Closure Orders, Schulmerich and other Business Class Members have and will continue to sustain monetary damages including loss in the value of the Tangible Property and Physical Locations, lost revenues, profits, expenses, attorneys' fees, and other costs incurred.

## COUNT III

**Carbalo, Helverson and Similarly Situated Employee Class Members**
**v.**
**Defendants**

### SUBSTANTIVE DUE PROCESS—42 U.S.C. §1983

### COVID-19 Closure Order Deprives Frank, Wendy and Employee Class Members of Life, Liberty and/or Property without Due Process of Law in Violation of the Fourteenth Amendment

141.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

142.    Never in the modern history of the United States – even in war time – has such a large number of Pennsylvanians been ordered not to work for so long by a government order.

143.    Frank, Wendy and other Employee Class Members have a protected liberty interest in their right to pursue any "lawful calling, business, or profession [they] may choose" free from arbitrary government interference and deprivation. *Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) (citing *Dent v. West Virginia,* 129 U.S. 114, 121-122 (1889)).

144.    The COVID-19 Closure Orders instructed all "non-life sustaining" businesses in Pennsylvania to shutdown indefinitely, without providing a mechanism to alleviate the economic harm to countless Employee Class Members – like Frank and Wendy – who were displaced as a result.

145.    ""[S]ubstantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty[.]'" *Salerno,* 481 U.S. at 746 (quoting *Rochin,* 342 U.S. at 172, and *Palko,* 302 U.S. at 325–326).

146.     The COVID-19 Closure Orders, therefore, violate Due Process by "interfere[ing] with rights 'implicit in the concept of ordered liberty[.]'" *Id.*

147.     Governor Wolf's Orders interfere with the rights of Frank, Wendy and all those workers similarly situated who are Employee Class Members by arbitrarily forcing these individuals to shoulder the financial burden for Executive Orders aimed at benefiting the public across the entire Commonwealth.

148.     The forced shutdown of all "non-life sustaining" businesses caused Frank and Wendy to lose their jobs, their livelihood, and their reputations in the community.  The same is true of other Employee Class Members.

149.     The Governor's COVID-19 Closure Orders, not only deprived Frank and Wendy of their profession – their ability to earn a living – the Orders simultaneously demanded that these workers subsidize the public health, safety and welfare of the Commonwealth.  The same is true of other Employee Class Members.

150.     The Due Process Clause of the Fourteenth Amendment prohibits Governor Wolf and Dr. Levine from demanding this hefty cost be paid by Frank, Wendy and other Employee Class Members; it is intended to protect individuals from this manner of arbitrary and irrational government interference.

151.     "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (quotations omitted).

152.     This interference by the COVID-19 Closure Orders "'shocks the conscience' and violates the 'decencies of civilized conduct.'" *See Lewis*, 523 U.S. 833, 846–47 (citations omitted).

34

153.    Allowing workers like Wendy, Frank and other Employee Class Members to personally bear the cost of Governor Wolf's COVID-19 Closure Orders "d[oes] not comport with traditional ideas of fair play and decency" and therefore violates substantive due process. *Breithaupt,* 352 U.S. at 435.

154.    Defendants' intentional, willful and wanton conduct 'shocks the conscience' of all citizens, who fear unchecked government intrusion for arbitrary and capricious ends – even if such ends are not ill intentioned.

155.    In depriving the workers like Wendy, Frank and other Employee Class Members of their protected liberty interests without due process of law, the Defendants have acted intentionally, willfully, wantonly, and with callous and reckless disregard for the constitutional rights Employee Class Members.

156.    As a direct and proximate result of the COVID-19 Closure Orders, Frank, Wendy and other Employee Class Members have and shall continue to sustain monetary damages including loss in the value of their livelihoods, attorneys' fees, and other costs incurred.

**COUNT IV**

**Schulmerich, and Similarly Situated Business Class Members**
**v.**
**Defendants**

**PROCEDURAL DUE PROCESS—42 U.S.C. §1983**

**COVID-19 Closure Order Deprives Schulmerich and Business Class Members of**
**Life, Liberty and/or Property without Due Process of Law**
**in Violation of the Fourteenth Amendment**

157.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

158.    Schulmerich and Business Class Members have a protected fundamental property right to use and enjoy land in which they hold a recognized interest (such as fee simple, or as a leasehold).  *See MFS,* 771 F. Supp. 2d at 440–41 (*citing DeBlasio,* 53 F.3d at 600); *see also Horne*, 576 U.S. 350, 135 S. Ct. at 2426.

159.    Under the Fourteenth Amendment, government actors must provide adequate due process procedures before or after divesting citizens of fundamental rights, which includes the property rights linked to the Physical Locations of Schulmerich and Business Class Members. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432-33 (1982); *Vitek v. Jones*, 445 U.S. 480, 495-96 (1980); *Tillman v. Lebanon County Correctional Facility*, 221 F.3d 410, 421 (3rd Cir. 2000).

160.    A claim involving procedural due process is evaluated by weighing "the private interest affected by the governmental action and the value of additional procedural safeguards" against "the fiscal and administrative burdens that additional procedures would impose on the government." *Rogin v. Bensalem Township*, 616 F.2d 680, 694 (3rd Cir. 1980).

161.    In conducting this procedural due process evaluation, this court should consider whether the following have been provided Schulmerich and other Business Class Members:  (1) notice; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses and respond to evidence; (6) the right to representation by counsel; and (7) a decision based on the record complete with reasoning for the result.  *Id.*

162.    The exigent nature of the circumstances surrounding the COVID-19 pandemic likely justify the need for quick action; however, the current exigencies do not allow Governor Wolf and Dr. Levine to permanently disregard the guaranteed safeguards of Due Process – especially when the fundament property rights of Business Class Members are at stake.

163.    The COVID-19 Closure Orders do not provide *any* procedural Due Process protections for Schulmerich and other Business Class Members who have been forced to standby as they have been divested of their Tangible Property and Physical Locations.

164.    The Governor has not created a meaningful mechanism to challenge his determinations as to whether a particular business ought to be permitted to operate their Physical Location – not prior to the deprivation, nor after (or during) the deprivation.

165.    Instead, Governor Wolf has authorized Schulmerich and Members of the Business Class to request an exemption to his Closure Orders through a waiver form submitted online to the Pennsylvania Department of Community Development via electronic mail.

166.    This mechanism is a wholly inadequate and does not satisfy the *Rogin* Due Process factors, especially the process required for deprivations of a fundamental right.

167.    Governor Wolf has not delineated any standards or criterion by which waiver requests will be evaluated.

168.    The waiver procedures provide no record of the materials submitted or used to evaluate the request for a waiver; once the waiver has been submitted online, no proof exists that the request was made.

169.    Furthermore, Governor Wolf offers no mechanism to appeal a denial of a waiver request.  After Business Class Members receive a denial, they are left with no recourse.  The taking of their Physical Location and Tangible Property remains in effect until Governor Wolf lifts the Closure Orders, and no other accountability exists.

170.    These lack of procedural safeguards – at any point – as it relates to the Property targeted by the COVID-19 Closure Orders deprives Schulmerich and all Business Class Members, who are similarly, of their fundamental property rights, without due process of law, based solely on the unappealable determination of Governor Wolf and Dr. Levine.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor, against Defendants jointly and severally, and seek relief for:

(1)     Compensatory damages adequate to satisfy Schulmerich and Business Class Members in the amount owed as just compensation for the regulatory taking of their Physical Location and Tangible Property;

(2)     Compensatory damages adequate to satisfy Frank, Wendy and Employee Class Members in the amount owed for Defendants' violations of the Due Process Clause of the Fourteenth Amendment;

(3)     Compensatory damages adequate to satisfy Schulmerich and Business Class Members in the amount owed for Defendants' violations of the Due Process Clause of the Fourteenth Amendment;

(4)     Punitive damages;

(5)     A declaratory judgment that issuance and enforcement of the COVID-19 Closure Orders is an unconstitutional taking without just compensation, under the Fifth and Fourteenth Amendment;

(6)     A permanent injunction to prohibit Defendants from enforcing the COVID-19 Closure Orders unless, and until, a mechanism is established to provide (a) just compensation for affected businesses and (b) appellate review of Governor Wolf's classifications determining whether individual businesses are "life sustaining";

(7)     An award of costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1988; and

(8)     Such other and further relief as this Court deems appropriate.

GOLDSTEIN LAW PARTNERS, LLC

By: /s/ _____

Jonathan S. Goldstein, Esquire (201627)
Shawn M. Rodgers, Esquire (307598)
11 Church Road
Hatfield, PA 19440
Phone: 610.949.0444
Fax: 610.296.7730
Email: jgoldstein@goldsteinlp.com
Email: srodgers@goldsteinlp.com

*Counsel for Plaintiffs*

40

## JURY DEMAND

Plaintiffs demand a jury trial on all counts contained in the Complaint.


GOLDSTEIN LAW PARTNERS, LLC


By: /s/
      Jonathan S. Goldstein, Esquire (201627)
      Shawn M. Rodgers, Esquire (307598)
      11 Church Road
      Hatfield, PA 19440
      Phone: 610.949.0444
      Fax: 610.296.7730
      Email: jgoldstein@goldsteinlp.com
      Email: srodgers@goldsteinlp.com

      *Counsel for Plaintiffs*

41